IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIEGO GAINES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 11 C 3496 |
| | ) | |
| K-FIVE CONSTRUCTION CORP., | ) | Judge George W. Lindberg |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is defendant K-Five Construction Corporation's ("K-Five") motion for summary judgment as to plaintiff Diego Gaines' ("Gaines") five-count Amended Complaint ("complaint") in its entirety.

*I. Introduction*

Gaines' complaint alleges claims for national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 *et seq.*, (Count I); retaliation in violation of Title VII (Count II); retaliation in violation of the Surface Transportation Assistance Act ("STAA"), 49 U.S.C. § 31105, (Count III); Illinois common law retaliatory discharge (Count IV); and failure to pay regular and/or overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), (Count V). For the reasons set forth more fully below, the motion for summary judgment is granted and judgment is entered in K-Five's favor as to all of Gaines' pending claims.[1]

---

[1] Plaintiff's motion to strike certain of defendant's Local Rule 56.1(a)(3)(b) responses to plaintiff's statement of additional facts [68] is denied as moot. The disputed facts and responses were not material to the resolution of the instant motion for summary judgment.

*II. Relevant Facts*

The following facts are undisputed unless specifically noted below. K-Five is a heavy highway paving contractor with its principal place of business in Lemont, Illinois. Gaines was employed as a seasonal semi-dump truck driver for K-Five from May 2007, until his termination on May 4, 2010. Gaines' primary job responsibility was to haul asphalt and other road building materials to and from job sites. Gaines' national origin is Mexican and during all times relevant to this case, he was a member of Teamsters Local 731 ("Local 731") and was covered by a collective bargaining agreement ("CBA") between K-Five and Local 731.

The CBA prohibited employment discrimination and during all times relevant to this case, K-Five maintained a written Equal Employment Opportunity Policy in its Employee Handbook that also prohibited discrimination based on national origin and prohibited retaliation for reporting alleged discrimination. Gaines received a copy of the Employee Handbook, but did not read the company policies regarding the reporting of harassment and discrimination.

K-Five also maintained a Driver's Manual that set forth the company rules, policies, and expectations for K-Five drivers. At the beginning of each construction season, typically in March, K-Five required all of its drivers to sign an affidavit acknowledging that they understood and agreed to abide by the rules and policies contained in the Driver's Manual. Between 2005 and 2010, Gaines signed the required affidavit at the start of each construction season. The Driver's Manual provided that after two warnings for violations of the rules set forth therein, the third offense in a 12-month period may result in discharge. It also provided that falsifying information on a Driver's Daily Report ("DDR") would result in discharge.

K-Five drivers were required to maintain DDRs, which included, among other things, a driver's start times, times drivers parked their trucks at the end of a shift, delays, accidents, and repair requests. Drivers submitted copies of the DDRs to the mechanic's shop and the main office. The mechanics reviewed the DDRs to identify needed vehicle repairs and to spot issues that may impact the safety of the vehicles. The main office used the DDRs to record employees' hours and to determine pay. At the top of the DDRs, in large, bold print, were boxes for drivers to report their "time start," "time start at job," "time finish at job," "and time parked." The K-Five payroll department only reviewed this top section of the DDRs when calculating the number of hours a driver worked and in determining wages.

Gaines completed a DDR for each day he worked at K-Five. On each DDR for May 24, 2008 through May 4, 2010, Gaines wrote down his assigned start time in the bold "time start" box at the top of each DDR. Except for Gaines' DDR for April 23, 2010, he did not include any notations regarding conducting pre-trip inspections of his assigned vehicle prior to his recorded "time start" at the top of the DDRs. Gaines did include notations regarding "pre-trips" at the bottom of a handful of DDRs between May 24, 2008 and May 4, 2010.

K-Five scheduled drivers to particular shifts and start times based on their seniority under the CBA and the needs of particular projects. Scheduled start times included adequate time for drivers to complete their pre-trip vehicle inspections. Nevertheless, Gaines routinely arrived at his assigned truck 15 minutes prior to his scheduled start time to perform his pre-trip inspections.

Gaines identified two instances during his employment at K-Five, when he felt co-workers made inappropriate comments related to his Mexican national origin. On July 17, 2009, Gaines reported to a K-Five supervisor that a fellow truck driver stated to Gaines over a CB

3

radio that Gaines should get a watch that was "made in America, not a foreign fucking country." K-Five management investigated Gaines' allegation. Management interviewed the fellow truck driver, who denied making any statement regarding the country where Gaines' watch was made. The fellow truck driver claimed that he only stated that his own watch was made in America. Management verbally reprimanded the fellow truck driver and told him to refrain from making potentially inappropriate comments to Gaines or other K-Five employees. Gaines never complained of any further statements by that fellow truck driver regarding Gaines' national origin.

 Gaines also reported to K-Five supervisors that on November 30, 2009, while Gaines was working at K-Five's O'Hare plant, he heard a different K-Five driver state over the CB radio that "Mexicans should go back to Mexico." That comment was allegedly made over a public CB radio frequency and could have been made by a non-K-Five employee. Gaines did not visually witness the comment being made, but claims that other coworkers agreed that the voice behind the comment matched the voice of a fellow K-Five driver. Further, K-Five does not equip its trucks with CB radios. In order to have heard the alleged comment, Gaines would have needed to have a personal CB radio in his truck. Unless specifically permitted by a K-Five supervisor, having a personal CB radio in a truck violates K-Five work rules.

 K-Five supervisors began investigating the alleged comment on November 30, 2009 by telephoning the driver who Gaines claimed made the comment. That driver denied making the comment and threatened to sue Gaines for defamation. The next day, K-Five supervisors personally met with the driver and he admitted to hearing the comment over the CB radio, but again denied making the comment. K-Five supervisors also interviewed Gaines and other K-Five

employees who were working at the O'Hare plant on November 30, 2009. Those employees had different views of the incident. One employee stated that Gaines did not have a CB radio in his truck on November 30, 2009, so he could not have personally heard the alleged comment. Another employee stated that the comment was definitely not made by the driver who Gaines identified as making the comment. A third employee agreed that the comment was made by the driver Gaines identified. In addition to interviewing employees about the comment, K-Five management asked Gaines to submit a written statement about the incident. Ultimately, K-Five management concluded that in light of conflicting evidence, they could not substantiate Gaines' allegations. Gaines never heard that alleged K-Five driver make any other comments related to national origin.

On January 12, 2010, Gaines filed a charge of discrimination with the EEOC, claiming that he was subjected to racial remarks, received a reduction in his work hours and less favorable shifts, and that his disciplinary history was not removed from his file.

During the 2009 and 2010 construction seasons, Gaines drove truck #4275 a majority of the time. On April 28, 2010, K-Five supervisor Bob Schwarz ("Schwarz") assigned Gaines to drive truck #4279. Prior to assigning truck #4279 to Gaines, Schwarz checked the truck and found that the truck's tail gate was closing properly and that there was no loose asphalt on the truck that he thought would fall off. Gaines also inspected truck #4279 and informed Schwarz that he would not drive that truck because it had caked on asphalt on the back gate, locks and pins, and in the spread pan. Gaines did not think truck #4279 was roadworthy.

In response to Gaines' complaints, Schwarz cleaned the loose asphalt from the spread pan and told Gaines that truck #4279 was safe to drive. Gaines still refused to drive the truck, so

5

Schwarz called another supervisor, Steve Radtke ("Radtke"). Thereafter, Schwarz assigned Gaines to truck #4289. Gaines found truck #4289 to be in acceptable condition and drove it for his April 28, 2010 shift. During that shift, Gaines reported to his supervisors that he almost got into an accident because of a problem with the steering in truck #4289. However, Gaines did not stop his shift early, or take truck #4289 immediately back to a mechanic after the steering problem. Gaines also did not report the steering problem on his DDR for that day.

The next day, April 29, 2010, Gaines was again assigned to truck #4289. That morning, Gaines informed Radtke that truck #4289 had a bad seat, steering problems, problems with closing the door, and problems with the rolling tarp. A mechanic repaired truck #4289's door so that it would close, and Gaines drove that truck on April 29, 2010. Gaines recorded the alleged problems with truck #4289 on his DDR for April 29, 2010. That evening, mechanics Rich Johnston ("Johnston") and Jim Clark ("Clark") inspected truck #4289, including a full inspection of all steering components. Johnston, a union-represented mechanic with 20 years of experience, did not observe any malfunctioning steering components or see anything that lead him to believe that the steering was unsafe. Additionally, truck #4289 passed its State of Illinois safety inspection on February 22, 2010 and no issues with the steering system were noted during that inspection.

On April 30, 2010, Gaines was again assigned to truck #4289 and initially refused to drive that truck, claiming that it was not roadworthy. Despite assurances that mechanics had found nothing wrong with the steering on truck #4289, Gaines still refused to drive it, so Radtke told Gaines to wash and wax truck #4289. As Gaines began washing truck #4289, Radtke asked another driver to test drive truck #4289. That driver drove truck #4289 and found that although

the steering pulled to the left, the driver though truck #4289 was roadworthy and fine to drive. After some additional dely, Gaines agreed to drive truck #4289 for his April 30, 2010 shift.

After his shift on April 30, 2010, Gaines spoke with mechanic Johnston about the steering problem in truck #4289. Gaines incorrectly documented his conversation with Johnston on his April 30, 2010 DDR. In that DDR, Gaines stated that Johnston "confirmed that steering drag link is offcentered" and placed the DDR in the mechanic's inbox for repair. On May 3, 2010, Johnston and another mechanic informed Radtke about the incorrect statement attributed to Johnston in Gaines' April 30, 2010 DDR. Gaines concedes that he may have misrepresented Johnston's statements about the steering in truck #4289, but contends that he believed he heard what he wrote on the April 30, 2010 DDR, and that any misstatement on the DDR is because Gaines is not a mechanic and does not have technical knowledge regarding the steering components in a truck. Another K-Five mechanic, Ed Tillman, worked on truck #4989 for 2.5 hours on April 30, 2010 and determined that the steering wheel itself was "off a tooth or two,." but that nothing appeared to be wrong with the drag link. K-Five also replaced the broken seat in truck #4989 on May 3, 2010. Between February 22, 2010 and April 27, 2010, four different K-Five drivers drove truck #4289 on five occasions and did not note any problems with the truck. In fact, a driver drove truck #4289 on April 27, 2010 for 70 miles and did not report any problems.

On May 3, 2010, K-Five management met to discuss the events of April 28-30, 2010 involving Gaines. Management decided to issue Gaines four warning slips. The first was for failing to cooperate with Schwarz on April 28, 2010 because management concluded that Gaines' refusal to drive truck #4279 was unreasonable. The second was for failing to cooperate

7

with Radtke on April 30, 2010 by not waxing truck #4289. The third was because management found that Gaines limited his output on April 30, 2010 by refusing to drive truck #4289 at the beginning of his shift. The fourth was for falsifying information on his DDR for April 30, 2010 by writing that mechanic Johnston confirmed that truck #4289's "steering drag link is offcentered." According to Gaines, he did not refuse to wax truck #4289, but instead did not have time to wax the truck before the test drive on April 30, 2010. Gaines also claims that he did not intentionally misstate his conversation with mechanic Johnston. K-Five decided to terminate Gaines' employment based on the four warning slips issued to Gaines for his conduct between April 28-30, 2010. Radtke communicated the termination decision to Gaines over the telephone on May 4, 2010.

Between April 17 and May 10, 2010, Gaines filed eight grievances pursuant to the CBA regarding his termination, regular and overtime pay, pension contributions, seniority rights, harassment and discrimination. Each grievance was denied by the Joint Labor Management Committee pursuant to the CBA's grievance and arbitration procedure. Shortly after April 24, 2010, Radtke received notice that Gaines filed a grievance claiming that he should have been paid for pre-trip inspection work he performed before his start times on April 13-16, 2010.

### III. Legal Analysis

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary

judgment, this Court "may not weigh the evidence or engage in fact-finding but should simply determine whether there is a genuine issue for trial." *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). However, when a party fails to make a showing sufficient to establish the existence of an element essential to his case, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23. The mere existence of a factual dispute is not sufficient to defeat a summary judgment motion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Instead, the non-moving party must present definite, competent evidence to rebut the summary judgment motion. *Id*.

      *A. Count I - National Origin Discrimination in violation of Title VII*

      In Count I of the complaint, Gaines claims that K-Five discriminated against him based on his Mexican national origin. The exact nature of Gaines' national origin discrimination claim is unclear, but it appears that Gaines is arguing that K-Five harassed him, issuing written warnings related to his conduct, and terminated his employment because of his Mexican national origin. As K-Five correctly notes in its reply brief, Gaines did not specifically address or provide any support for this claim in his response to the motion for summary judgment. Accordingly, Count I is deemed abandoned and summary judgment is entered in K-Five's favor as to Gaines' national origin discrimination claim. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003).

      Further, even if Gaines had not abandoned his national origin discrimination claim, there is no evidence in the record that any of K-Five's employment decisions related to Gaines were based on his Mexican national origin. Additionally, the July 17, 2009 and November 30, 2009 incidents outlined above are not sufficient to establish a claim for harassment. *See Stephens v.*

*Erickson*, 569 F.3d 779, 790 (7th Cir. 2009).

A plaintiff can utilize either direct or indirect evidence to establish an employment discrimination claim. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 394 (7th Cir. 2010). There is no direct evidence of national origin discrimination. Additionally, plaintiff has not cited to any evidence that he was treated less favorably than similarly situated employees who were not of Mexican national origin. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010).

To establish that another employee is similarly situated, Gaines must show that there is someone who is directly comparable to him in all material respects. *Bio v. Federal Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005). "This requires the plaintiff to show not only that the employees reported to the same supervisor, engaged in the same conduct, and had the same qualifications, but also show that there was no 'differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them.'" *Ineichen v. Ameritech*, 410 F.3d 956, 960-61 (7th Cir. 2005) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F,3d 612, 617-18 (7th Cir. 2000)). Gaines has not cited to any non-Mexican semi-dump truck drivers who falsely reported a mechanical problem on their DDR. He also has not identified any non-Mexican semi-dump truck drivers who accrued at least four warnings in a twelve-month period for conduct similar to his and who were not terminated. Accordingly, Gaines has not established that he was treated differently than a similarly situated employee and K-Five is entitled to summary judgment as to Count I. *See Ineichen*, 410 F.3d at 960.

*B. Count II - Retaliation in violation of Title VII*

Next, the Court turns to Gaines' retaliation claim under Title VII. Similar to his national

origin discrimination claim, Gaines has not presented evidence that he was treated less favorably than similarly situated employees who had not filed grievances or complained about the condition of K-Five trucks. To establish a retaliation claim using direct proof, Gaines must establish that he (1) engaged in statutorily protected activity, (2) suffered a materially adverse action, and (3) a causal connection exists between the two. *Argyropoulos v. City of Alton*, 539 F.3d 724, 733 (7th Cir. 2008). Using indirect proof, Gaines must establish that he: (1) engaged in statutorily protected activity; (2) suffered a materially adverse action; (3) met K-Five' legitimate expectations; and (4) was treated less favorably than similarly situated employees who did not engage in protected activity. *Id*. There is no evidence in the record regarding other K-Five dump-truck drivers who made similar vehicle complaints and filed similar grievance and were treated more favorably than Gaines.

Additionally, Gaines cannot establish that he was meeting K-Five's legitimate work expectations at the time of his termination. Gaines admits that statements he attributed to mechanic Johnston in his DDR for April 30, 2010 were not correct. In that DDR, Gaines wrote that mechanic Johnston confirmed that truck #4289's "steering drag link is offcentered." Johnston never made such a statement and the steering drag link on truck #4289 was not in fact offcentered. According to K-Five's Driver's manual, DDRs are company records and falsifying a company record is a terminable offense.

Gaines attempts to explain away what he wrote on his April 30, 2010 DDR by stating that he "wrote down to the best of his ability and recollection what Johnston told him." Gaines further claims that because he is not a mechanic and is not familiar with the mechanical functions of a truck, he should not be held accountable for misunderstanding or misstating what

11

Johnston told him. Gaines' perception of his actions and job performance are not sufficient to raise a genuine issue of material fact ast to whether he was meeting K-Five's legitimate job expectations at the time of his termination. *Watts v. SBC Services, Inc.*, 05 C 3111, 2006 WL 2224054 at *5 (N.D.Ill. 2006).

At the start of the 2010 construction season, Gaines signed an affidavit acknowledging that he understood and agreed to abide by the rules and terms contained in the Driver's Manual. One of those rules prohibits falsifying information on DDRs and provides that doing so is a terminable offense. Gaines concedes that he included false, or as he characterizes it "incorrect," information related to truck #4289's steering in his DDR, but argues that K-Five should not have terminated him based on that conduct because it was not that big of a deal. It is well established that a court will "not sit as a super-personnel department that reexamines an entity's business decisions." *Hudson v. Chicago, Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004). The evidence in the record establishes that Gaines was not meeting K-Five's legitimate job expectations because he committed what K-Five's rules stated was a terminable offense. According, K-Five is entitled to summary judgment as to Count II.

*C. Count III - Retaliation in violation of the STAA*

K-Five argues that Gaines' retaliation claim under the STAA fails as a matter of law because Gaines did not engage in a protected activity under the STAA. In order to state a retaliation claim under the STAA, plaintiff has the initial burden of showing "1) that he engaged in protected activity under the STAA; 2) that he was the subject of adverse employment action; and 3) that there was a causal link between his protected activity and the adverse action of his employer." *Roadway Exp., Inc. v. U.S. Dept. of Labor*, 495 F.3d 477, 481 (7th Cir. 2007)

(quoting *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 229 (6th Cir. 1987)). An employee's refusal to operate a vehicle is protected under the STAA only if it is based upon a reasonable apprehension of serious injury to himself or the public because of the vehicle's unsafe condition. 49 U.S.C. § 31105(a)(B)(ii). An employee's apprehension of serious injury is not reasonable unless "a reasonable individual in the circumstances then confronting the employee would conclude that the unsafe condition establishes a real danger of accident, injury, or serious impairment to health." 49 U.S.C. § 31105(a)(2).

Gaines' repeated refusals and delays in driving truck #4289 between April 28-30, 2010 did not constitute a protected activity because they were not based upon an objectively reasonable belief that the truck was unsafe. Gaines drove truck #4289 for 95 miles on April 28, 2010 and did not report any safety problems on his DDR for April 28, 2010. Gaines drove truck #4289 for another 76 miles on April 29, 2010 before reporting steering problems and other issues on his DDR for that day. That night, two mechanics inspected truck #4289 and found nothing wrong with the steering and addressed some of the other issues raised by Gaines in his April 29, 2010 DDR. Despite the mechanic's work, Gaines refused to drive truck #4289 on April 30, 2010. Gaines still delayed in driving truck #4289, even after another driver test drove the truck and concluded that it was safe to drive. Under these facts, a reasonable individual would not conclude that truck #4289 was unsafe to drive between April 28-30, 2010. Therefore, Gaines' repeated delays and refusals to drive truck #4289 were not protected activity under the STAA and K-Five is entitled to summary judgment as to Count III.

*D. Count IV - Retaliatory discharge in violation of Illinois public policy*

In order to survive summary judgment on his common law retaliation claim, there must

be some evidence in the record that Gaines' termination violates a clear mandate of public policy. *Turner v. Memorial Medical Center*, 233 Ill.2d 494, 504 (2009). Gaines concedes that he included incorrect information on his DDR for April 30, 2010, which is a terminable offense as outlined in the Driver's manual. K-Five terminated Gaines because of this offense and various other conduct violations. There is no evidence in the record that these stated bases for K-Five's decision to terminate Gaines' employment were pretextual for retaliation, or a violation of Illinois public policy. Accordingly, K-Five is entitled to summary judgment as to this claim. *See Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1162 (7th Cir. 1995).

  *E. Count V - Violation of the FLSA*

  Finally, the Court turns to Gaines' claim that K-Five violated the FLSA because it refused to pay him for required pre-trip and post-trip safety inspections on his vehicle. Gaines appears to have abandoned his claims related to unpaid post-trip inspections. Gaines did not address the post-trip inspections in his response brief to K-Five's motion for summary judgment and also did not include any facts related to alleged post-trip inspections in his Amended L.R. 56.1(b)(3)(c) statement of additional facts. Accordingly, this claim is deemed abandoned and summary judgment is entered in K-Five's favor as to Gaines' claims related to unpaid post-trip safety inspections. *See Palmer v. Marion County*, 327 F.3d 588, 597-98 (7th Cir. 2003).

  As for the pre-trip safety inspections, Gaines states that he routinely arrived at his truck 15 minutes prior to his scheduled start time to conduct those inspections. However, Gaines does not state that K-Five required that he arrive prior to his scheduled start time and Gaines does not provide any evidentiary support to contradict K-Five's statement that scheduled state times incorporated adequate time to complete pre-trip and post-trip inspections and thus drivers did not

need to start work before their scheduled start times. Further, it is uncontested that, except for his April 23, 2010 DDR, Gaines wrote down his scheduled start time in the "start time" field at the top of his DDRs, and that K-Five relied upon the information in the "state time" field to calculate hours worked and applicable wages. Gaines failed to present any evidence that K-Five had actual or constructive knowledge that he was conducting pre-trip inspections prior to his assigned start time. Accordingly, K-Five is entitled to summary judgment as to Gaines' FLSA claim related to pre-trip inspections. *See Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 177 (7th Cir. 2011).

## *IV. Conclusion*

For the reasons set forth more fully above, defendant's motion for summary judgment [41] is granted. Judgment is entered in favor of defendant as to plaintiff's complaint in its entirety.

**ORDERED**: Defendant's motion for summary judgment [41] is granted. Plaintiff's motion to strike certain of defendant's Local Rule 56.1(a)(3)(b) responses to plaintiff's statement of additional facts [68] is denied as moot. All matters pending before the Court having been resolved, this civil case is terminated.

Entered: _____
George W. Lindberg
Senior U.S. District Court Judge

Dated: May 7, 2012